**John D. HUDSON, Plaintiff,**

v.

**James D. JENKINS, Judge of the Eighth Judicial District, Defendant.**

**No. 63392.**

Supreme Court of Iowa.

Feb. 20, 1980.

John A. McClintock and David L. Brown of Hansen, McClintock & Riley, Des Moines, for plaintiff.

Thomas J. Miller, Atty. Gen., and Jeanine Freeman, Asst. Atty. Gen., for defendant.

Considered by REYNOLDSON, C. J., and REES, HARRIS, McGIVERIN and LARSON, JJ.

LARSON, Justice.

This plaintiff, a lawyer, challenges a contempt citation arising out of his alleged violation of an order entered by the defendant judge. We hold that the actions of the plaintiff did not constitute contempt and therefore sustain the writ of certiorari.

The confrontation involved here began with plaintiff's representation of Allen Dean Kempf in connection with a bank robbery case in federal district court. As a result of that involvement, Hudson became aware of Kempf's prior entry of a guilty plea to state charges arising out of the same incident. Hudson had not been involved in those proceedings, but discussed the matter with Kempf's trial counsel, Charles Pettit. He was advised that there were serious questions as to the adequacy of the proceedings transferring Kempf from juvenile to adult court and as to the guilty plea, which had been entered against the advice of counsel. Kempf's age, sixteen, and his limited mental capacity, together with other information gleaned by Hudson from Kempf's prior counsel, apparently prompted Hudson to recommend an appeal from the sentence imposed by Judge Jenkins. Kempf wrote to Hudson to request that he represent him in the appeal and sent a request to the defendant judge that Hudson be appointed at county expense.

The request for appointment of counsel was heard by Judge Jenkins, who raised the

issue of whether Kempf really desired to appeal in view of the fact he had pled to a reduced charge and ran a risk of increased punishment if convicted of the original charge. He also evidenced some concern about the cost to the county in the event the appeal was taken by Hudson on a court-appointed basis. The application for appointment was not resisted by the county attorney's office. The judge decided to appoint a "disinterested" person to discuss the matter of the appeal with Kempf, as shown by the record set out below. Because we must assess the effect of the colloquy, it is necessary to set it out at some length.

THE COURT: Well, in view of the fact that your interpretations are entirely different than that of this court [as to whether Kempf wants to appeal], and in view of the fact that you yourself seek to be appointed to represent Mr. Kempf, and in view of the fact that Mr. Kempf seems to have shown a dramatic reversal of his intentions in a period of about one week, as best I can the court feels that it should appoint someone to investigate the matter and to report back to this court.

The person that is appointed will have no authority to prosecute the appeal. It seems to me as I discussed with you on the telephone, Mr. Hudson, that the attorney who handles the appeal has a vested economic interest, because, as you indicated to me on the telephone, you would probably charge Van Buren County in the neighborhood of $50 an hour, and you anticipated somewhere in the neighborhood of 50 hours of work. That is twenty-five hundred dollars as probably a minimum, and I am sure that you, as an officer of this court, would not allow such consideration to bend your judgment.

However, in order that this Court may be satisfied that Mr. Kempf has been fully advised of his rights and that he fully understands the peril in which he could potentially place himself by such an appeal, the Court would order that an attorney be appointed to investigate Mr. Kempf's wish, apparent wish, for an appeal and report Mr. Kempf's wish to this court by next Friday, which would be March 30, 1979.

Do you have any suggestions as to who the attorney should be? It is my understanding that Mr. Kempf is in Anamosa.

MR. HUDSON: Your honor, it is my understanding that he was in Polk County jail, but it was my understanding that he would be transported today to Anamosa. That was told to me by the U.S. Attorney.

THE COURT: Do you have any suggestions as to who should be named as an attorney, understanding that they would not be the attorney who would handle the appeal. I don't know how else to remove the economic interest in this case.

MR. HUDSON: Could I speak to that point?

THE COURT: Certainly.

MR. HUDSON: As I recall our conversation on Wednesday of this week, you indicated to me that I would be—probably be, charging $50 an hour, and I informed the Court that I didn't think that it would take one hundred hours, and the court said to me, how long about will it take, and I replied I don't know your Honor. I further replied that the compensation is set by the Court, and not by me, and whatever the hourly rate the court cares to compensate.

I do not think that it is fair to impugn to me motives other than in the best of Mr. Kempf.

THE COURT: I do not impugn motives to you, in fact, I just finished saying that the economic interest would not bend your judgment as an officer of this court.

My concern at this point is Mr. Kempf's right and seeing that his rights are fully and totally protected. It is not in whether or not John D. Hudson is going to be appointed to represent Mr. Kempf.

MR. HUDSON: I understand that, your Honor.

THE COURT: Very well, I am sorry. Going back to my previous question, Mr. Lytle or Mr. Hudson, is there anyone in particular, or do you have any sugges-

tions as to appointment of counsel to go to Anamosa and report back to the Court?

MR. LYTLE: It makes no difference to the state whether it would be a local attorney, or one in the area or one nearer Mr. Kempf's location.

MR. HUDSON: I don't know an attorney in this county.

THE COURT: Well, I will get on the telephone as soon as we are finished here and see if I can locate somebody who would be available to go up Des Moines, or to Anamosa and talk to Mr. Kempf sometime during the coming week and report back to the court.

MR. HUDSON: It is my understanding that the Application is denied?

THE COURT: No, the Application is to be acted upon next week when whoever I have appointed to investigate to determine what the actual wishes of Mr. Kempf are.

MR. HUDSON: The court does not accept my statement on behalf of Mr. Kempf?

THE COURT: You are putting words in my mouth, Mr. Hudson. I said that I am going to appoint someone to make an independent investigation of what Mr. Kempf's wishes are. You are telling me now that he wants to appeal a case that he was begging to plead guilty to. We had, at the time of his sentencing on March 9, a series of letters introduced into evidence by his counsel running back into early February in which he was begging to plead guilty and which he was begging to work out the kind of arrangement with prosecution that he ultimately worked out, and now you are telling me that a week—less than a week after having left here he has changed his mind. That is something I wish investigated.

MR. HUDSON: Very well, your Honor.

(Record closed at 9:45 a. m.)

Thereupon, Hudson left and proceeded to file a notice of appeal. He was immediately recalled by the judge and the following ensued:

(Record reopened at 9:51 a. m.)

THE COURT: Let the record show that this is again the matter of the State of Iowa vs. Allen Dean Kempf. Mr. Hudson, do I understand that immediately following the Court's decision in this case regarding your request, and the Court indicating that it was going to appoint an independent attorney to investigate Mr. Kempf's situation that you filed a written Notice of Appeal?

MR. HUDSON: Yes.

THE COURT: What was the purpose in doing so?

MR. HUDSON: To commence the appeal.

THE COURT: Do you understand that in so doing that you were taking the matter out of this court's hands?

MR. HUDSON: Yes, your Honor.

THE COURT: I find your action to be willful contempt of this court, Mr. Hudson, and although I am not fully sure what I am going to do about it, you can be assured that a transcript of the proceedings here this morning will be forwarded to the Ethics Committee of the Iowa State Bar Association.

Now, if you have anything that you would like to say in explanation of why you filed your Notice of Appeal after I had indicated to you that I wanted an independent counsel to investigate this matter and report it to this court so that this court could fully protect Allen Dean Kempf's rights, I would be happy to have you say it on the record at this point.

MR. HUDSON: Your Honor, it is my understanding that Mr. Kempf has an absolute constitutional right to appeal. In conferring with Mr. Kempf I am convinced that it is right to make such an appointment. I would point to the letter that is in the record of Harry A. Mahannah dated February 27, 1979 indicating that "It is my opinion that he would be most appropriately handled through the juvenile court system than through the adult court system. I feel that involvement in the adult penal system could do significant harm to this individual." For

what it's worth, your Honor, I join Harry A. Mahannah in those words, and it is my opinion that time is of the essence in proceeding with this appeal.

THE COURT: You feel that one week is going to make a difference?

MR. HUDSON: Yes, your Honor.

THE COURT: Very well, if that is your reason.

MR. HUDSON: That is my reason.

THE COURT: Is there anything further that you wish to say on the record?

MR. HUDSON: Only that Mr. Charles K. Pettit joins in my opinion as does Roxanne Conlin and Kermit Anderson of the U.S. Attorney's Office for the Southern District.

THE COURT: If the federal people were so interested in the prosecution of this matter they should have taken this up. They did prosecute the adults.

MR. HUDSON: I can't speak for that, your Honor.

THE COURT: I can and have.

MR. HUDSON: Anything further, your Honor?

THE COURT: No, except that you understand that your actions are not going to be paid by Van Buren County. What you are doing is on your own. I want to make sure that you clearly understand that. Do you clearly understand that?

MR. HUDSON: Yes, your Honor.

(Record closed at 9:59 a. m.)

Despite this development, the appeal was prosecuted and resulted in a reversal. *State v. Kempf*, 282 N.W.2d 704 (Iowa 1979). Hudson now challenges the contempt matter through a certiorari action asserting that the judge acted illegally and without jurisdiction. In substance, he claims that there could be no contempt because the "order" of the court pertained only to his application for court appointment, not to the appeal itself. Further, he contends that even if it could be construed to order a delay in filing notice of appeal it would be unenforceable as an impermissible interference with Kempf's right of appeal.

Acts constituting contempt are set out in section 665.2, The Code, as follows:

The following acts or omissions are contempts, and are punishable as such by any of the courts of this state, or by any judicial officer, including justices of the peace, acting in the discharge of an official duty, as hereinafter provided:

1. Contemptuous or insolent behavior toward such court while engaged in the discharge of a judicial duty which may tend to impair the respect due to its authority.

2. Any willful disturbance calculated to interrupt the due course of its official proceedings.

3. Illegal resistance to any order or process made or issued by it.

4. Disobedience to any subpoena issued by it and duly served, or refusing to be sworn or to answer as a witness.

5. Unlawfully detaining a witness or party to an action or proceeding pending before such court, while going to or remaining at the place where the action or proceeding is thus pending, after being summoned, or knowingly assisting, aiding, or abetting any person in evading service of the process of such court.

6. Any other act or omission specially declared a contempt by law.

■ The trial court's summary order does not specify in what manner the actions of the plaintiff were contemptuous. In this respect, we should point out that in summary contempt matters such as this it is required that the judge recite in his order the specific facts constituting the contempt. § 665.9; *see also* Fed.R.Crim.P. 42(a). The purpose of such requirement is not to give notice to the alleged contemnor, or to frame the issues to be tried, but solely to permit an appellate court to review the judge's action. *See United States v. Marshall*, 451 F.2d 372, 377 (9th Cir. 1971).

■ In the absence of equivalent specificity by the trial judge here, we view the provisions of our contempt law in light of the facts set out in the record. Subsections 4, 5 and 6 of section 665.2 are made inappli-

cable by their terms. "Contemptuous or insolent behavior toward such court" in subsection 1 has been applied when the manner of conduct itself was contemptuous, such as hitting, threatening, yelling or impugning the court's motives. *See, e. g., Newby v. District Court*, 259 Iowa 1330, 147 N.W.2d 886 (1967); *Bisignano v. Municipal Court*, 237 Iowa 895, 23 N.W.2d 523 (1946), *cert. denied*, 330 U.S. 818, 67 S.Ct. 674, 91 L.Ed. 1270 (1947); *Harding v. McCullough*, 236 Iowa 556, 19 N.W.2d 613 (1945); *Russell v. French*, 67 Iowa 102, 24 N.W. 741 (1885). There was no such conduct in this case. Was this plaintiff's action, however, a "willful disturbance calculated to interrupt the due course of [the court's] official proceedings" or "[i]llegal resistance to [an] order or process made or issued by it," as set out in subparagraphs 2 and 3? We believe it was neither.

In the case of *In re Criminal Contempt of McConnell*, 370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962), the Supreme Court discussed the meaning and application of a federal contempt statute based upon "misbehavior" resulting in "obstruction" of the proceedings. McConnell, a lawyer, persisted in asking questions he deemed necessary as foundation for an offer of proof, despite the judge's order to stop. Faced with a choice of having an insufficient record on review or proceeding in violation of the court's order, McConnell decided to take his chances with the latter. "Obstruction" under the federal statute, 18 U.S.C. § 401(1), and "interruption" under our statute, section 665.2(2), were treated by the Court as synonymous terms as evident from this language:

> [W]hile this statute undoubtedly shows a purpose to give courts summary powers to protect the administration of justice against immediate *interruption* of court business, it also means that before the drastic procedures of the summary contempt power may be invoked to replace the protections of ordinary constitutional procedures there must be an *actual obstruction* of justice.

*McConnell*, 370 U.S. at 234, 82 S.Ct. at 1291, 8 L.Ed.2d at 437 (emphasis added).

■ There is no evidence in the instant case that filing the notice of appeal "interrupted" the proceedings within the meaning of our contempt statute. It would, of course, divest the trial court of jurisdiction of the criminal matter, and it is possible that the trial court perceived this to be an interruption of the proceedings. However, because the appointment of appellate counsel is collateral to the criminal prosecution, trial court jurisdiction over that issue was not divested by perfection of the appeal. *Kempf*, 282 N.W.2d at 711. Moreover, if we were to rule that Hudson acted contemptuously merely because his actions divested the court of jurisdiction, the filing of every notice of appeal could expose the attorney to a contempt citation. Since there was no evidence of actual interruption to provide a basis for contempt under section 665.2(2), the issue narrows to whether the acts involved amount to an "[i]llegal resistance to any order or process made or issued by" the court under section 665.2(3).

■ The ruling by the trial court in this case did not clearly prohibit what was done. It was entered following a hearing on the application for court appointment and purported only to postpone decision on that matter. Defendant does not challenge this assessment of the ruling but argues that an order delaying the appeal was implicit in the decision to continue the matter of the appointment application. He contends that plaintiff, as an attorney, should have so interpreted the order and should have abided by the terms implicit in it. In other words, he contends the plaintiff violated the spirit of the order, if not its terms. However, it is doubtful whether there was any order in existence at the time the notice of appeal was filed; the judge had merely indicated he was going to appoint an investigator and said "the application [for court appointment] is to be acted upon next week when whoever I have appointed to investigate [has] determine[d] what the actual wishes of Mr. Kempf are." In addition, even if we were to assume there was an order, it was not so clear and unambiguous

in its terms that a contempt charge could be based upon it.

In *Lynch v. Uhlenhopp*, 248 Iowa 68, 78 N.W.2d 491 (1956), this court recognized the general principle that "judgment[s] must be definite and certain" and observed:

This is particularly true in contempt proceedings, where the alleged contemnor is in danger of drastic punishment if the judgment does not clearly inform him what is required. The contempt proceeding is so near in its nature to criminal prosecutions that the well-known rule which commands that one cannot be convicted of a crime unless the statute is clear and definite so that he may know what he can and what he cannot do, is at least analogous.

The Supreme Court of California has said: "The rights of the parties under a mandatory judgment whereby they may be subjected to punishment as contemnors for a violation of its provisions, should not rest upon implication or conjecture, but the language declaring such rights or imposing burdens should be clear, specific and unequivocal so that the parties may not be misled thereby." *Plummer v. Superior Court*, 20 Cal.2d 158, 164, 124 P.2d 5, 8.

248 Iowa at 72, 78 N.W.2d at 494. This is in accord with the general rule, stated as follows:

Before a person may be held in contempt for violating a court order, the order should inform him in definite terms as to the duties thereby imposed upon him, and the command must therefore be express rather than implied. Indefiniteness and uncertainty in a judgment, order, or decree may well constitute a good defense in proceedings for contempt based on violation of the judgment, order or decree. The very nature of the proceeding in either civil or criminal contempt for an alleged disobedience of a court order requires that the language in the commands be clear and certain. Whether the allegedly violated order contains such language depends upon the circumstances of the individual case.

17 Am.Jur.2d *Contempt* § 52, at 54–55 (1964) (footnotes omitted). The Supreme Court has also noted the requirement of specificity in a court's order:

The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid. Because the decree of this District Court was not so framed, it cannot stand. And with it must fall the District Court's decision holding the union in contempt.

*International Longshoremen's Association v. Philadelphia Marine Trade Association*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236, 245 (1967).

In this case Hudson's acts violated no terms of the "order" unless we read them into it by implication. We cannot, however, supply by interpretation constraints which are not expressed in it, especially when the result is to apply powers of the court as formidable as contempt. A lawyer must have considerable latitude in these circumstances to protect the rights of his client. The Supreme Court has recognized this balancing of interests:

While we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom, or even from conduct so near to the court as actually to obstruct justice, it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases. An independent judiciary and a vigorous, independent bar are both indispensable parts of our system of justice. To preserve the kind of trials that our system envisages, Congress has limited the summary contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice, and we think that that power did not extend to this case.

*McConnell*, 370 U.S. at 236, 82 S.Ct. at 1292, 8 L.Ed.2d at 438–39. We believe those comments are equally applicable to our own contempt statute.

This plaintiff contends that even if the order was clear and otherwise valid, it could not be enforced because that would be an unconstitutional interference with his client's right of appeal. Because of our disposition of this matter on the grounds discussed, we need not address that issue. We note, however, that we have serious doubts about the propriety of such order even if, as the defendant judge contends, it was entered for the laudable purpose of protecting the rights of a criminal defendant.[1]

We conclude that the acts of this plaintiff did not amount to contempt; to the contrary, we believe his strenuous representation of his client in the face of these consequences is commendable. The writ of certiorari is sustained.

WRIT SUSTAINED.

---

1. The defendant argues that this investigation was advisable because Kempf had been anxious to get the case over with and might not want to have it reinstated. We have held, however, that even when a defendant expresses reluctance to file an appeal, a lawyer is nevertheless under a duty to pursue it if it reasonably appears that the defendant is incapable of making an intelligent decision on the question. That is the situation in this case. *See State v. Aumann*, 265 N.W.2d 316, 319 (Iowa 1978).